# EXHIBIT A



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

AUSAR MADISON et al
Vs.                                                    C.A. No.      2018 CA 006902 B
HOWARD UNIVERSITY et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum.  As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge ELIZABETH WINGO
Date:  October 1, 2018
Initial Conference: 9:30 am, Friday, December 28, 2018
Location:  Courtroom A-47
             515 5th Street NW
             WASHINGTON, DC  20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

__Ausar Madison and Kai Tease__
                                                    Plaintiff
                    vs.
                                                                    Case Number   **2018 CA 006902 B**

__Howard University__
__2400 Sixth St NW__                                 Defendant
__Washington, DC 20059__

### SUMMONS

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

__Stuart L. Peacock, Esq.__
Name of Plaintiff's Attorney

__1311 Buchanan Street NW Washington DC 20011__     By _____
Address

__(202) 714-6800; stuart.l.peacock@gmail.com__
__DC Bar 428908__                                      Date   10/01/2018
Telephone

如需翻译, 请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828     ይደውሉ

     IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                              Super. Ct. Civ. R. 4





### TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
#### DIVISIÓN CIVIL
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____ Demandante

contra

_____

Número de Caso: _____

_____ Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

*SECRETARIO DEL TRIBUNAL*

Por: _____

_____
Dirección

Subsecretario

_____

Fecha _____

_____
Teléfono

如需翻譯,請打電話 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202)879-4828 로 전화주십시오      አማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

**IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._**

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]

Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Ausar Madison and Kai Tease
_____
                                    Plaintiff
                vs.

                                            Case Number   **2018 CA 006902 B**

Kevin Nickelberry
6th & Girard Streets, NW, Suite 1013          Defendant
Washington, DC 20059

**SUMMONS**

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Stuart L. Peacock, Esq.
_____
Name of Plaintiff's Attorney                    *Clerk of the Court*

1311 Buchanan Street NW Washington DC 20011       By _____
Address                                                          Deputy Clerk

(202) 714-6800; stuart.l.peacock@gmail.com
DC Bar 428908                                    Date            10/01/2018
Telephone
如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                    Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                            Demandante

               contra                                    Número de Caso: _____

_____
                            Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____              *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

                                          Por: _____
_____
Dirección                                                      Subsecretario

_____
                                          Fecha _____
Teléfono
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 보시려면 (202) 879-4828 로 연락주시기 바랍니다         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                      Super. Ct. Civ. R. 4

**Filed**
**D.C. Superior Court**
**09/28/2018 26:35PM**
**Clerk of the Court**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | |
|---|---|
| Ausar Madison<br>6515 Belcrest Rd.<br>Hyattsville, MD 20782, and<br><br>Kai Tease<br>3551 Camino Cielo<br>Lincoln, CA 95648,<br><br>Plaintiffs,<br><br>vs.<br><br>Howard University<br>2400 Sixth St NW<br>Washington, DC 20059, and<br><br>Kevin Nickelberry<br>Howard University<br>Department of Athletics. Burr Gymnasium<br>6th & Girard Streets. NW, Suite 1013<br>Washington, DC 20059,<br><br>Defendants. | Civil Action No.  2018 CA 006902 B |

## COMPLAINT

## JURY TRIAL DEMANDED

COME NOW Plaintiffs Ausar Madison and Kai Tease (collectively, "Plaintiffs" or the "Aggrieved Students") by and through their attorney, Stuart L. Peacock (DC Bar 428908), and move this Court for Judgment against Defendants Howard University and Kevin Nickelberry (collectively "Defendants") and in support thereof state as follows:

## PARTIES

1.      Plaintiff Ausar Madison ("Madison") is a resident of Maryland.   At all times relevant herein, he was a student at Defendant Howard University.

2.      Plaintiff Kai Tease ("Tease") is a resident of California.   At all times relevant herein, he was a student at Defendant Howard University.

3.      Defendant Howard University ("Howard" or "Howard University") is a private federally chartered university with its principal location in the District of Columbia.

4.      Defendant Kevin Nickelberry ("Nickelberry") was employed by Howard in the District of Columbia as the head coach of Howard's basketball team.

## JURISDICTION

5.      Jurisdiction and venue are proper because the acts complained of herein occurred in the District of Columbia and because Howard is located in the District of Columbia.

## STATEMENT OF FACTS

6.      Howard University's basketball program purposefully violates NCAA rules regarding the safety of athletes by forcing its students, including the **Aggrieved Students**, to engage in illegal, grossly-excessive regulated athletic activities, resulting in catastrophic physical, emotional, and financial damages to Howard's players, often in a manner that ends their professional careers before they start.   The **Aggrieved Students** are two such players who now bring an action for gross negligence, intentional infliction of emotional distress, and related claims against Howard and its basketball head coach, Kevin Nickelberry.   Such claims are based on Nickelberry's egregious violations of NCAA rules regarding the safety of athletes and regarding fairness in competition.   Those violations caused serious physical and emotional injury, and financial harm to the **Aggrieved Students**.   This is also an action for fraud, breach of contract, and related claims against Howard for Nickelberry's inducement of the **Aggrieved Students** through material misrepresentations and omissions, as well as Howard's failure to adhere to Nickelberry's empty promises regarding scholarships.

7.      The **Aggrieved Students** are not attacking Howard as a whole, and certainly are not attacking the vast majority of its educators, many of whom are top-notch ethical professionals. This lawsuit is about the Howard's responsibility to make the **Aggrieved Students** whole and to put an end to the cheating, fraud, and abuse that has become commonplace in the athletic program, and especially in Nickelberry's basketball program (the basketball team itself, the "Bison").

8.      Nickelberry disregarded the athletes' safety and wellbeing, engaged in psychological abuse as set forth hereinbelow.

9.      Nickelberry subjected the **Aggrieved Students** to *countable athletically related activity* that exceed the permissible limits under NCAA regulations sometimes up to a threefold. He played the **Aggrieved Students** when they were injured despite the objections of the **Aggrieved Students** as well as the warnings of his own staff.  If he perceived that the students were even slightly resisting his dangerous demands to unreasonably risk serious injury, he would resort to verbal and emotional abuse as well as public shaming as a method of manipulation.

10.      The **Aggrieved Students** were highly regarded basketball players in high school. They were sought after and recruited by Division 1 schools.  They opted to attend Howard because of being heavily lobbied by Head Coach Nickelberry and his staff, as well as being the most prestigious HBC in America.  **Aggrieved Students** wanted to learn about Black history and culture.

11.      While the **Aggrieved Students** have come before this Court with individual claims, dozens of other students throughout the years could have brought similar claims.   Indeed, Howard's basketball players have been and are injured at a disproportionately high rate comparative to the players at every other NCAA Division 1 basketball program.

12.      When Plaintiff Madison was a senior in high school during the 2012-2013 academic year, Madison's high school basketball team finished eighth in the nation and he attained the team status of National All-Stars.  He was a starter and also played alongside five players on the team who eventually made it to the NBA.  Madison was heavily recruited by top four-year colleges and universities in the country, including Harvard University.

13.     Tease was the highest scoring player on his high-school basketball team – ever. He also was heavily recruited by top Division 1 colleges and universities. He was very concerned with the level of education he would receive at various schools. He came to Howard induced by Nickelberry and several of his misrepresentations, including that Nickelberry would value academics more than other coaches.   Nickelberry expressly assured Tease and his family that he personally would ensure Tease receive the accommodations and academic resources he required per Tease's medically prescribed needs.

14.     The **Aggrieved Students** could have possibly played professionally in the NBA and almost certainly in an international league, but that is increasingly unlikely for both of them now because of their injuries.  Those injuries are of course very physically painful as well.  They also have not been able to take advantage of all aspects of Howard's educational opportunities, which were of paramount importance when they agreed to play basketball at the school.  They had other options and chose Howard because of Nickelberry's misrepresentations and/or omissions such as failing to disclose his modus operendi of consistently operating outside of and breaking of NCAA rules.

15.     Plaintiffs are informed and believe that a quid pro quo culture existed amongst administrators, the coaching staff, the team's physician, and certain students.   Serious questions persist involving the veracity of the basketball team's records according to Athletic Department employee Cheri Hodges.  **Aggrieved Students** and other NCAA Division I basketball programs and student-athletes may have been harmed and cheated by improperly obtained medical waivers and serious allegations of financial fraud and unlawful acts in furtherance of career advancement and financial reward.  Plaintiffs are informed and believe that Nickelberry and others accepted gifts and merchandise from athletic companies like Nike and Under Armor and insisted some Howard's student-athletes use the attire.  Nickelberry's strategy in retaining his coaching position and earning bonuses caused a disproportionate number of players' injuries that disrupted or destroyed their playing careers, particularly those in the position of point-guard.

16.     A prime example of Howard's gross disregard is illustrated by an incident when Howard's Athletic Director, Davis, is recorded on audio stating to a concerned parent that he is unaware of the rules that govern the weekly and daily hours of *countable athletically related activity*. In a senior position, Davis had an express duty to guarantee compliance to the NCAA Bylaws. He admits to nearly half a dozen violations. Davis explained to the father of an **Aggrieved Student** that he approves of Nickelberry removing his son from a starting position due to Davis's personal lack of observations of the son's participation in *voluntary athletically related activity* with coaching staff in the gym. Apparently, Davis was unaware that he was breaking over half-a-dozen NCAA Bylaws, because it is impermissible for the athletic department to report to coaching staff who is or is not partaking in *voluntary athletically related activities* in the month of September (non-playing pre-season), nor should Davis have been using or allowing coaching staff to use *voluntary athletically related activities* as a basis to "provide recognition or incentives . . . based on . . . attendance or performance in the [voluntary] activity (17.02.19(c))." Davis also failed to know that "[p]rior to the start of on-court preseason basketball practice *[typically the first week of October or last week of September]* members of the institution's coaching staff may not be involved with one or more team members at any location . . . .(e) . . . using basketball equipment [i.e. a basketball], [or] (f) [o]bserving student-athletes in any basketball activities even if such activities are not arranged by the institution's coach." *See NCAA Bylaws* Section 17.3.2.4 (e), (f). Despite years of warnings from numerous parents, Davis chose to be willfully ignorant of the violations that were taking place of which he himself was a participant.

17.     Such evidence without limitation includes (1) numerous damning and highly troubling recorded conversations of coaches and administrators; (2) sworn statements of percipient witnesses; (3) text message and email traffic showing, among other things, orders by coaching staff to practice in a manner that routinely and methodically exceeds what is allowed under NCAA regulations; (4) other documents evidencing admissions of misconduct by coaching staff and other administrators; and (5) medical records of the **Aggrieved Students.**

18.     Such evidence will be presented to the court if and when appropriate.  Attached hereto as **Exhibits A, B, C, and D** is a sample of documents that shows that a key allegation here – impermissible practices – were routinely required by Nickelberry and the coaching staff. Respectively, attached is (A) a sworn statement of an athletic trainer; (B) several days' worth of text messages where the Assistant Coach Coutreyer is ordering and coordinating impermissible practice and training during the offseason, in contravention of NCAA bylaws; (C) a mandated <u>summer</u> workout plan to Madison that required reporting to coaching staff; and (D) an offseason email from Coutreyer ordering Tease to follow a certain other workout plan that was impermissible because it required 7 days a week of practice and additional weight training that had to be reported and documented to the coaching staff, which when aggregated to the impermissible excess training hours, all but guaranteed sacrificing academia, bodily harm and injury.

19.     In or around January of 2014, Madison, a freshman starting-line point guard on Howard's team, broke his foot during competition.    At the hospital, x-rays revealed he had suffered a stress-Jones fracture, an injury necessarily the result of over-use and/or excessive prolonged exertion.

20.     In high school Madison was bestowed the title of a National All-Star point-guard and played starting point-guard in the nation's number eight ranked team.

21.     In the Summer of 2013, Madison had a prearranged meeting at Howard with Nickelberry, in violation of NCAA 13.7.1.1.  Nickelberry and his staff had on numerous occasions reached out to Madison when he was a high school student and had established a rapport with his father, whom they knew was a Howard alumnus.  The meeting took place at one of Howard's basketball courts, where nearly a dozen student-athletes were participating in an off-season impermissible practice game, in violation of NCAA Bylaws Section(s) 13.7.2.7, 17.3.2.4(a)(b)(c)(e)(f), 17.3.2.1, 17.3.6, 17.3.6.1, 17.7.2.4, and, 17.1.7.2.1.5.1.  Nickelberry invited Madison to join the game.  After observing his prowess on the court, Nickelberry guaranteed him a starting position on the team, along with a full scholarship.  However, Nickelberry explained that since he had already allocated all the scholarships for the year, Madison would have to cover his

own costs for the first year, but Nickelberry guaranteed him a perpetual scholarship thereafter. The following express guarantee was witnessed by Madison's father and another Howard alumnus.

22.     Upon commencement of the 2013 Fall semester, Nickelberry ordered players to begin full on-court training, with up to a dozen players at a time, a month earlier than when the practice season should have begun with hyper-intensive, high-impact training and exercises, and practice games [in violation of 17.1.7.2.2, and 17.1.7.2.4. *Countable athletically related activity* – a term of art under NCAA regulations – ranged between thirty to over forty hours per week. The coaching staff did not properly record the excessive *countable athletic related activity*, which is a trademark of the programs' fraudulent nature, in violation of 17.1.7.3.4. During this period the NCAA bylaws do not permit more than eight (8) hours of *countable athletically related activity* per player, with no more than four players engaging in *skill related instruction* at any one time anywhere under the direction or supervision of coaching or athletic department staff. No basketball equipment (i.e., a basketball) was permitted on-court in either *skill instruction* or in *conditioning* exercises (conditioning activities were permissible on court so long as no equipment was used). During this period and every semester thereafter, the NCAA bylaws were trounced and enforced by use of verbal bullying, and with threats pertaining to loss financial aid and playing positions.

23.     For a minimum of three mornings per week Madison was required to participate in required weight/strength conditioning at 7:00 AM, which lasted nearly an hour or an hour and a half. Madison would meet with an assistant coach (Whalen, Travis, or a graduate assistant) midday for individual skill training, which would last one to two hours. These sessions could take place between three to five times a week. In the evenings, mandatory practices took place between three to five days a week. These practice sessions lasted approximately three hours or longer, exclusive of the hour spent stretching and warming up. Assistant Head Coach Coutreyer was well known for stating that basketball season is year-round. (See Exhibit D). The imposed basketball schedule hardly deviated whether Madison was participating in out-of-season practice (eight-hour maximum) or in *playing season* (twenty-hour maximum).

24.     When the regular contest season started, full practice meets were limited to two to four days a week, depending on how many games took place that week.  However, even on traveling game days, players were required to review video footage on the bus and were also required to meet at the host institution's courts to practice for an hour or two, which violated several NCAA Bylaws.  Players were also required to meet for video reviewal or talks (team-meets or individually by coaches several times a week, which could account for an additional four or more hours per week.  Cribbs recollects that the men's basketball team often participated in *countable athletically related activity* seven days a week during the playing period; in violation of NCAA Bylaws Sections(s) 17.1.7.4

25.     Madison's required participation far exceeded the twenty-hour cap for *countable athletically related activity*.  On January 25, 2014, he suffered a fracture to the fifth metatarsal of his right foot (aka a "stress-Jones fracture," which was referenced above).  As also stated above, the fracture itself often occurs acutely but the repetitive stress that leads up to the sudden fracture has built up over time.  Madison sat out the rest of the season without the benefit of "red-shirt" status because he had already participated in too many NCAA games for the 2013-2014 season.  Madison remained obligated to attend all team meets and practices, both permissible and impermissible, and both local and home games.  During this time, Nickelberry appeared to only care about when Madison would return to the court than whether he would return to the court healthy.

26.     Nickelberry called Madison's father in early 2014 to reassure him that his son's scholarship for the next academic year was secure despite suffering a bone fracture.  However, when the 2013-2014 academic year was over, Nickelberry met with Madison to inform him that he would not receive a scholarship for the upcoming 2014-2015 school year.  Nickelberry claimed the scholarship would better serve the team by bringing in a new recruit.  Still, Nickelberry promised Madison that he would receive a scholarship in his junior year, *i.e.*, the 2015-2016 year.

27.     Nickelberry ordered Madison to partake in impermissible team exercises and practices shortly after the season ended in March 2014.  Madison, as well as those in and near the

team, like Cribbs and teammate Hill, knew Madison was still suffering from pain and needed healing. On several occasions he did rebuff the coaches' pressures to overexert himself.

28.     Madison returned home to California at the close of the 2014 school year. That summer he followed a prepared workout plan that he received from the coaching staff. He and some other players were expected to report back to the coaches with documentation that reflected fulfillment of the workout regimen. Fulfillment of the routine required at between thirty-to-forty-hours of activity per week in violation of NCAA Bylaws Sections(s) 17.1.7.2.1, and possible violation(s) of NCAA Bylaw Section(s) 17.02.19(a)(b)(c), 17.1.7.2.1.5.1, 17.3.2.3, 17.3.2.4(f).

29.     In August 2014, Madison returned to campus. He voiced concern about the pain he continued to experience in his right foot and knee. He explained to the coaches that he was "not 100%" healed and that he "should take it slow in the upcoming [three-day exhibition] games" in Canada. Nickelberry disregarded his concerns.

30.     In Canada, Madison specifically told Nickelberry that, aside from the prescribed summer drills, since the time he broke foot, he had not played enough basketball nor engaged in any player-on-player play to prepare him for the upcoming exhibition competition. Furthermore, in the presence of other staff and players, he told the coaching staff that he had been feeling a lingering pain in his right knee over the summer while partaking in the prepared workout plan. Madison repeatedly implored Nickelberry that Madison needed to "take it easy," and, "had to take it slow and ease back" into participation, just as his medical providers had ordered him to communicate to his coaches over the summer. An athletic trainer, Kenosha, who was also present at the Canadian exhibition games, echoed the same concerns regarding Madison's injuries to Nickelberry. When Madison voiced his concern once more as he was ordered onto the court for the commencement of the first game, Nickelberry told him "he would be alright," and he should "push through the pain," because he would only play him for a few minutes.

31.     Despite Nickelberry's promises and Madison's expressing of concerns, he was inserted into the game for approximately twenty-five minutes of play time. After the first day's

game, Madison experienced excessive swelling to his knee, forcing him to ice and elevate his leg over the course of the next twelve or more hours. Nickelberry knew of Madison's injury.

32.     Prior to the second game, Madison spoke to Nickelberry and told him that he was feeling substantial pain in his knee and foot. He told him that it would be "wise to only play [him] for a few minutes or not at all."

33.     Madison was placed in the game for nearly fifteen minutes, until he fell hard right on his knee. He was in excruciating pain and could not stand on his own and he had to be carried to the sideline.     Athletic trainer Kenosha suspected that Madison was suffering from chondromalacia, and she advised that he immediately refrain from anymore participation and seek immediate care.

34.     Madison was badly injured when he returned to Howard. He sought treatment from the team physician/surgeon, Dr. Thompson, who continually pushed Madison to undergo cortisone injections in lieu of rest or time-off. Dr. Thompson's prescribed course of treatment prioritized Madison's return to the court over Madison's wellbeing, and the course of treatment placed Madison at unreasonable and serious risk of further injury.

35.     After returning from Canada, Madison and Cribbs decided that Madison should sit out the first three weeks of the preseason and focus on rehabilitation, in order to heal and avoid permanent injury.  Cribbs confided in Madison that, based on her experience and education, the impermissible schedule imposed by Nickelberry was likely responsible for his broken foot.

36.     After receiving word of Madison and Cribbs's request, Nickelberry and other coaching staff convened a meeting with Madison and communicated that if he was not participating in the preseason practices and workouts, then it would have a "negative effect" on his position in the rotation. They never expressed any concern for his health, despite knowing s's expressly communicated warnings about his knee and foot remaining in a precarious state. Madison explained to them that prematurely returning to practice would only make his injuries worse. However, the coaching staff remained firm with their ultimatum and therefore he felt he had no choice but to participate fully.

37.     By September of 2014, Madison had rejoined the excessive preseason practice schedule, and his injuries only grew worse.  After every workout his knee would inflame until he was unable to bend his leg.  Cribbs pleaded with the coaching staff to sit him out and focus on physical therapy because, in her professional opinion, serious permanent physical damage was occurring.  On a few rare occasions, Madison was granted permission not to participate.  However, following any reprieve, Nickelberry would pressure him to reengage in team activities by threatening his position in the rotation.  Furthermore, Nickelberry would publicly shame Madison by claiming he was faking his pain and injuries to get attention because he is a "momma's boy," or because he was "short", and a "pussy nigger" "scared of being bullied by real niggers."

38.     In Nickelberry's habitual fashion, when the official basketball season for 2014-2015 commenced, he substantially ramped up training and practice hours far beyond the twenty hours permitted by NCAA guidelines.  Having been put on notice that his collegiate and professional basketball career was on the line if he did not participate in full, Madison put a knee brace on and tried to play through the pain.  As a quick fix, again, Dr. Thompson advocated cortisone injections as a means to ramp-up Madison's scoring and statistical productivity by masking the pain yet sure to cause even further harm.

39.     During this season and at least one other, in violation of Section 17.17.3.2.1 of the NCAA Bylaws, Coach Nickelberry forced Madison and the whole team to engage in punitive impermissible practices upon reaching campus from away-games after losing in competition (in the same calendared day).  These practices were especially high impact and intense to ensure its castigatory purpose, made only more punishing by the fact a full-fledged competition had occurred.

40.     Starting December of 2014, Madison was red-shirted, which means that the team doctor had determined he was too injured to play for the rest of the season.  When the 2014-2015 academic year ended, Nickelberry again reneged on his promise to secure Madison a scholarship.  Madison returned home to California during the summer of 2015 and continued physical therapy and medical treatment on his right leg; which was funded by his family.

41.     Before his return to campus for the 2015-2016 academic year, Madison's injuries had been healing well.   When the *non-playing* preseason season began, he was immediately required to engage in twenty-to-thirty hours a week of *countable athletically related activity*; in violation of NCAA Bylaws Section(s) 17.1.7.2(a), 17.1.7.2.3, 17.3.1, 17.3.2.1, 17.3.2.3, and 17.3.2.4.  Thus, due to the excessive and impermissible training schedule, his injuries started to worsen.

42.     Madison noticed a substantial difference in his abilities during the 2015-2016 regular season because of his worsening injuries.  The stress-Jones fracture he had suffered, and the derivative injuries it had caused, including chondromalacia to his knee made a professional contract impossible, and thus caused and will continue to cause Madison to suffer pecuniary loss and emotional distress.

43.     Madison's continued to be required by Nickelberry to engage in intense practice four to seven hours a day and *at least* six days a week; in violation of NCAA Bylaws Section(s) 17.1.7.2(a), 17.1.7.2.3, 17.3.1, 17.3.2.1, 17.3.2.3, and 17.3.2.4.

44.     During this season, on-court practices lasted well over three hours a day. Nickelberry often said "[w]e can be here all night[,]" in violation of NCAA Bylaws Section(s) 17.1.7.2, and 17.1.7.9.5.  On one specific occasion that season, Nickelberry stated before the entire team, "I didn't bring you here to be students."  Practices that began 6:00PM or 7:00PM, typically ended after 11:00PM or midnight, and sometimes even later, thereby violating NCAA Bylaws Section(s) 17.1.7.9.5.

45.     Madison was both physically and mentally worn out due to the excessive *countable athletically related activity*.  He found it impossible to keep up with his rigorous academic schedule while participating in the basketball program and his grades suffered.

46.     In May 2016, at the Annual End of the Year Meeting, Nickelberry, again, refused Madison a scholarship for the coming academic year.   Nickelberry expressly stated that, because of his injuries, he wasn't worth the scholarship, adding, "your daddy's rich enough to pay for the tuition."

47.     In the summer of 2016, like the previous summers, Madison returned home to California and followed Nickelberry's thirty to forty-hour workout regimen.  Madison was required to fill out the accompanying charts and return them to Assistant Head Coach Coutreyer, in violation of NCAA Bylaws Section(s) 17.02.19(a)(b)(c), and possible violation of NCAA Bylaws Section(s) 17.1.7.2, 17.1.7.2.1, and 17.1.7.2.2.

48.     In the summer of 2016, Madison also sought treatment from Dr. Shields.  In July they met to discuss the lingering yet acute pain in his knee.  The doctor confirmed that he still suffered from chondromalacia, which his stress-Jones fracture caused by forcing him to place irregular pressure on his knees.

49.     Dr. Shields prescribed that Madison also seek treatment from a physical therapist in Anaheim, California.  Howard did not pay for Madison's physical therapy despite Nickelberry's assurances that it would, and his expression assertion to Madison that the NCAA rules even required Howard to do so.

50.     At the start of the 2016-2017 academic year, Madison fully participated in all coaching staff mandated activities, in violation of NCAA Bylaws Section(s) 17.1.72(a), 17.3.2.3, and possibly 17.3.2.4.  Again, he was forced to engage in excessive hours of *countable athletically related activity* beyond those permissible under NCAA guidelines.

51.     Madison played in twelve games over the course of the 2016-2017 season.  On January 7, 2017, Madison quit the basketball program.  He believed that his foot and knee problems had rendered him an ineffective player, but more importantly, he sought to focus on his studies that had suffered as a result of his excessive practice and training schedule.  Currently a fifth-year student, Madison has never received any funds from an athletic scholarship.

52.     In or around April 2017, Madison's father along with another teammate Keon Hill's father set an appointment with Howard President Wayne Frederick to discuss the persistent, impermissible, and dangerous level of *countable athletic related activity* required by Nickelberry.  Frederick did not appear for the meeting, and they discussed the matter with Strategic Initiatives Advisor Calvin Hadley.  The next day, they expressed the same concerns in a meeting with Athletic

Director Kery Davis. Despite the detailed concerns and complaints relayed in those meetings, no changes to the basketball program have ever been made.

53.     In the Summer of 2015, Tease's grandparents enrolled him in Howard's summer basketball program for high school students. Within weeks of joining the program, Nickelberry began to heavily court Tease to join Howard's Division I basketball program upon high school graduation. Nickelberry promised Tease comprehensive scholarships of 4 to 5 years and a guaranteed starting line-up position for the entirety of his academic enrollment, housing, and most importantly academic support.

54.     Tease and his family repeatedly communicated to Nickelberry that Tease's enrollment would be contingent upon guaranteed special academic support, which was the family's paramount concern with respect to selection of a university. Tease had learning disorders that required him to work with tutors and other educators. He also required accommodations such as extra-time on exams. Time and time again, Nickelberry personally ensured that Tease would receive all the academic support required, supplied and subsidized by Howard.

55.     In or around November 2015, Tease, a juvenile at the time, signed an athletic scholarship with Howard, which included student housing, in return for agreeing to play the position of point-guard on the Bison basketball team.

56.     On or about May 18, 2016, Tease began mandated training while away campus. He was required to maintain and return documentation to the Howard coaching staff that ensured he was training four to eight hours a day, seven days a week while at home during the summer, in violation of NCAA Bylaws Section(s) 17.1.7.2.1, and 17.02.19(a)(b)(c), and possible violation(s) of NCAA Bylaw Section(s) 17.02.19, 17.1.7.2.1.5.1, 17.3.2.3, 17.3.2.4(f).

57.     On or about June 20, 2016, Tease began the summer school program and training with the basketball team at Howard. He was required to participate in individual skill instruction, training, and practice that exceeded twenty-four hours a week of *countable athletically related activity* [in violation of NCAA Bylaws Section 17.1.7.2.1.5.1] and involved offensive and defensive alignments that were specifically forbidden by NCAA Bylaws Section 17.1.7.2.1.5. An

- 14 -

additional 1.5 to 2 hours of "open gym" was required during non-workout days and Whalen would impermissibly take attendance at the gym during those days, in violation of NCAA Bylaws Section(s) 17.02.19(a)(b)(c), and17.1.7.2.1.5.1. "Open gym" is a term of art that by definition is permitted only as *voluntary athletically related activity*, and there not only cannot be any requirement to participate but also cannot be any *countable* coaches present.

58.     By August 2016, Tease's required training and practice sessions totaled dozens of hours a week and involved all the coaching staff and virtually the entire team, in violation of NCAA Bylaws Section(s) 17.1.7.2.1.5.1, 17.02.19(a)(b)(c), 17.1.7.2.3, 17.1.7.2.2 17.1.7.3.4, 17.3.2.1, 17.3.2.3, and 17.3.2.4.

59.     August 2016 marked a shift in Nickelberry's treatment of Tease.  Nickelberry started berating, bullying, and harassing Tease on a daily or near-daily basis.  He frequently called Tease "dumb ass," "stupid ass," "bitch," motherfucker", and "fake nigger."  Nickelberry sometimes even began practices or meets by announcing, "dumbest motherfucker on the team y'all," while pointing at Tease.  This conduct forced Tease to actively conceal his professionally prescribed need for academic support and accommodations.

60.     Nickelberry's patronizing only intensified when Tease had difficulty learning certain offensive and defensive plays.  Tease's family had discussed with Nickelberry that Tease would need access to the team playbook to study the plays because of his learning disability, and the family was assured that would happen. But Tease was purposefully denied access during most of his time at Howard.  When asked why by Tease, Nickelberry insensitively told Tease he was "too dumb," to be "trusted," with strategies.

61.     Tease never received any special academic assistance or accommodations beyond what was available to other student-athletes, and Nickelberry did not bother to even inform proper administrators/staff of Tease's accommodation needs.

62.     By late August 2016, Tease was required to participate in nearly forty (40) hours of *countable athletically related activity* a week in violation of NCAA Bylaws Section(s) 17.1.3.2.4(a)(b)(c)(e)(f), 17.1.7.2.1(a), 17.1.7.2.3, and 17.1.9.5.  The intensity of the sessions

exerted unreasonable pressure and strain on his body. Tease and his father, amongst others, made complaints regarding the impermissible excessive *countable athletic related activity* and reckless orders for athletes to overexert themselves during practices to Howard employees and staff, including Nickelberry and Assistant Coach Coutreyer.

63.     During a pre-season game, on October 29, 2016, Tease suffered a stress-Jones fracture. Two weeks leading up to the injury, Tease started to complain to Nickelberry, Coutreyer, Dr. Thompson, and [athletic trainer] Cribbs, among others, that Tease had increasing pain and immobility in his foot.

64.     Before October 29, 2016, Tease sought the care and diagnosis of team physician and surgeon Dr. Thompson. Without conducting a thorough examination or seeking x-rays, Dr. Thompson told Tease that his injury was probably a sprained ankle. He advised Tease to ice his ankle and foot, and to "take it easy for a few days," and then "slowly get back into the team's routine."

65.     During this period Tease was on the bench because Cribbs insisted he be pulled from practice to treat and provide relief from the growing discomfort in his foot. On October 29, despite knowing of Tease's condition, Nickelberry insisted that Tease had to play. Cribbs strongly urged and pleaded with Nickelberry not to let Tease play. Nickelberry nevertheless played him for over 20 minutes until he suffered the stress-Jones fracture.

66.     As early as January 2017, although officially "red-shirted" for the season, the coaching staff began pressuring Tease to return to the court and engage in practice and/or training. Tease rebuffed the pressure by the coaching staff, which resulted in increased pressure and mistreatment for Tease. Week after week the conduct of the coaching staff, particularly Nickelberry and Coutreyer became increasingly cruel and outrageous.

67.     On or around April 15, 2017, Tease's father contacted Nickelberry to inform him that Tease would not be returning to Howard for the next academic year.

68.     Nickelberry "begged" both father and son to reverse their decision. Nickelberry communicated to the Teases that he could be in danger of losing his job, if Tease were to leave Howard.

69.     On or around April 22, 2017, Tease and his father notified Nickelberry that Tease would remain at Howard premised on the condition that fundamental changes to the character of the basketball program be implemented.

70.     Nickelberry promised that he would conform to NCAA bylaws and would seek outside help for his "personality disorders[1]."

71.     On or around July 1, 2017, Tease returned to campus for the summer period and rejoined the team in practicing and training.

72.     Despite Nickelberry promises, Tease and the rest of the team were practicing and training far in excess of the eight hours of *countable athletically related activity* permissible during the summer, in violation of NCAA Bylaws Section(s) 17.1.7.2.3, 17.1.7.2(a), 17.1.7.2.1.5.1, 17.1.7.2.1, 17.1.3.2.4(a)(b)(c)(e)(f) and 17.1.3.2.3.   Team practices involved impermissible offensive and defensive alignments, were longer and more intense than usual, and that took a substantial toll on Tease's foot, which was still not at 100%. *Countable athletically related activity* neared nearly 25 to thirty 30 hours per week.

73.     During this period, Nickelberry's mistreatment of Tease worsened.

74.     On September 16, 2017, the full coaching staff and team held a meeting.  Tease recorded the meeting on a digital recorder. Nickelberry and Coutreyer openly flaunted breaching NCAA bylaws. Coutreyer admits to engaging impermissible *countable athletically related activity* breaching NCAA Bylaws Section(s) 17.1.7.2(a), 17.3.1, 17.3.2, and 17.3.2.1. Coutreyer is also recorded either intentionally or negligently misrepresenting what accounts for *countable athletic*

---

[1] Nickelberry made similar promises to seek professional mental health treatment to Reverend Dr. Terry Hill, the father of another student-athlete who confronted Nickelberry about an expletive-laden outburst toward his son before a live television audience during a game, then getting caught lying about calling Dr. Hill's son to apologize.

*related activity* by telling the student-athletes that they will be required to engage in impermissibly excessive *countable activity* but implicitly classifying video/film-reviews, chalk-talk/team-meets, and "other things that *must* be done," outside of what is deemed *countable athletic related activities*, while demanding participation. Pursuit to NCAA Bylaws Section 17.02.1, video/film-reviews and chalk-talk/team-meets are *countable athletic related activity*. Coutreyer implicates the program in participating in nearly double the allowable hours permissibly allotted. The recording also captures Coutreyer demand from the student-athletes to "do now, what you will be doing in November." November is official playing season, which permits twenty-hours of *countable athletic related activity*, which is 110% more than what was permissible in September [in violation of Section 17.1.7.2(a)].

75.     Over two hours of the recording solely features Nickelberry engaging his student-athletes about the benefits of them submitting their "loyalty" to him. Nickelberry discussed how "loyalty" could mean the difference between one having their failing grades overlooked while receiving "credit," or on the other hand, one losing their scholarship. In fact, Nickelberry is caught on the voice recording confirming that he arranged to have the rules broken for a player who would otherwise would have been suspended due to bad grades. Nickelberry directly addresses that player who is sitting amongst the players stating, "I had your back, now have my back." [2] He goaded the players to report him to the authorities, specifically stating, ". . . go ahead and report me to the NCAA, I don't give a fuck about NCAA rules anyway." He also mentioned Tease by name, stating that he has "no respect" for him because he had family and "opportunities" when he was growing up.

76.     On September 21, 2017, Tease's father called and confronted Davis about the pervasively broad nature of illegal and abusive conduct by the coaching staff. Davis acknowledged seeing the impermissible practices.

---

[2] Nickelberry had another student-athlete read aloud text messages from Nickelberry's phone written by Howard's President Fredricks evidencing the school credit claim.

77.     On September 25, 2017, Tease's father submitted a written complaint to Davis. The compliant stated that the basketball program at Howard was being run in an unlawful fashion in contravention of NCAA Bylaws, with the acquiescence and approval of the Howard's Athletic/Compliance Department.

78.     On December 10, 2017, Tease's father spoke to Howard compliance officer Cheri Hodges about Tease's situation and the overall climate for students in the basketball program. Hodges advised Tease to, "save [his] son and get him out of [Howard]". She warned that Tease would likely be further subjected to excessive impermissible activity.

79.     In December 2017, Tease left Howard.

80.     Howard's conduct, as described in paragraphs 1 though 79 above, was performed or ratified by its employees, servants and/or agents Nickelberry, Monteiro, Davis, Frederick, and Hadley (collectively "Agents"). The Agents were each responsible for overseeing a substantial portion of the Howard's operations, and each exercised substantial discretionary authority over vital aspects of such operations, including making significant decisions that affected Howard's internal policies. The Agents engaged in malicious, fraudulent, and oppressive conduct that justifies an award of punitive damages.

81.     In committing the foregoing acts as set forth above in paragraphs 1 through 79 above, the Agents willfully disregarded the **Aggrieved Students'** rights to be free from intentional and/or reckless infliction of injury and fraud.

82.     In committing the foregoing acts as set forth in paragraphs 1 through 79 above, the Agents acted despicably and subjected the **Aggrieved Students** to cruel and unjust hardship in conscious disregard for their rights under District of Columbia law.

83.     In committing the foregoing acts as set forth in paragraphs 1 through 79 above, the Managing Agents intended to cause emotional and financial injury to the **Aggrieved Students**.

## First Cause of Action

### (Gross Negligence)

### (All Aggrieved Students Against All Defendants)

84.     **Aggrieved Students** incorporate by reference hereinafter all preceding paragraphs.

85.     Defendants Howard and Nickelberry recklessly endangered the **Aggrieved Students.**

86.     Defendants undertook and assumed a duty to protect the physical and mental well-being of all student athletes participating in Howard's basketball program, including the **Aggrieved Students.**

87.     Defendants further undertook and assumed a duty to abide by NCAA and university rules specially designed to avoid the risk and harm that did and continues to befall the **Aggrieved Students**. Defendants regularly represented to the public, the NCAA, and the student body that it abided by the NCAA rules, thereby *not* exposing student-athletes, including the **Aggrieved Students,** to excessive practice and training.

88.     Defendants knowingly, recklessly, and wantonly failed to undertake their duties through its actions and omissions.  Howard either intentionally turned a blind-eye to the conduct and acts of Nickelberry and the other coaching staff in its basketball program, and/or its senior management knowingly acquiesced to Nickelberry's activities. These activities involved extreme deviation from the ordinary standard of care as to support a finding of wanton, willful, and reckless disregard or conscious indifference for the rights and safety of others, including the **Aggrieved Students**.

89.     As a direct and proximate result of Howard's conduct, the **Aggrieved Students** have suffered and will continue to suffer economic damages including but not limited to past medical bills, future medical bills, past psychological bills, future psychological bills, past physical therapy bills, future physical therapy bills, and loss of future economic opportunity.

90.     As a direct and proximate result of Howard's grossly negligent conduct, the **Aggrieved Students** have suffered and will continue to suffer non-economic damages including

but not limited to a deterioration of psychological, emotional, academic, athletic status, pain, suffering, mental anguish, depression embarrassment, humiliation and disfigurement, all of which is permanent.

91.    Additionally, the **Aggrieved Students** seek punitive damages because the conduct of the Defendants was cruel, extreme and shocking to the conscious.

92.    **Wherefore,** the **Aggrieved Students** demand judgment against Defendants in an amount to be determined at trial but believed to be in excess of $9,000,000 in damages, plus attorneys' fees and costs, and such other and further relief as this Court deems just and proper.

### Second Cause of Action

### (Negligent Infliction of Emotional Distress)

### (All Aggrieved Students Against All Defendants)

93.    **Aggrieved** Students incorporate by reference hereinafter all preceding paragraphs.

94.    Defendants undertook a duty to protect the physical, mental, and emotional wellbeing of the **Aggrieved Students**.

95.    Defendants violated NCAA regulations that were designed to avoid the risk and harm that did and continues to befall the **Aggrieved Students**.

96.    As a result of Howard and its agents' recklessness and/or gross negligence as stated above, the **Aggrieved Students** have suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills; past academic bills, future academic bills; and loss of future economic opportunity.

97.    As a direct and proximate result of Howard and its agents' recklessness and/or gross negligence as stated *supra.,* the **Aggrieved Students** have suffered and will continue to suffer non-economic damages including but not limited to a deterioration of their collegiate and/or professional status as athletes, daily embarrassment and shame, pain, suffering, anguish, depression, embarrassment, humiliation and disfigurement, all of which is permanent.

98.    Additionally, the **Aggrieved Students** seek punitive damages.

99.     **Wherefore,** the **Aggrieved Students** demand judgment against Defendants in an amount to be determined at trial but believed to be in excess of $9,000,000 in damages, plus attorneys' fees and costs, and such other and further relief as this Court deems just and proper.

<u>**Third Cause of Action**</u>

**(Fraudulent Misrepresentation)**

**(All Aggrieved Students Against All Defendants)**

100.     **Aggrieved Students** incorporate by reference hereinafter all preceding paragraphs.

101.     Defendants represented to the **Aggrieved Students** and the public at large that it undertook and assumed a duty to follow and abide by the rules and bylaws of the NCAA to protect the integrity and fairness of the Division 1 basketball program, the academic well-being and success of all student athletes, and to protect and promote the physical wellbeing of all its student-athletes, including the **Aggrieved Students** from foreseeable harm. Defendants, as NCAA members and signatories, undertook and assumed a duty to protect student-athletes, including the **Aggrieved Students**, from excessive and burdensome practices and/or training regiments.  The NCAA rules were in place precisely to avoid the risk and harm that did and continues to befall the **Aggrieved Students.**

102.     Defendants intended to deceive the public and other concerned entities, including the **Aggrieved Students** about the true nature of the basketball program, and the deception of the **Aggrieved Students** was for recruitment and retention purposes.

103.     Defendants' representations were false.  To the extent these representations were no affirmatively made the **Aggrieved Students**, Howard's practice of not abiding by NCAA regulations was a material omission when recruiting them and throughout their attendance.

104.     These representations or omissions were material to the **Aggrieved Students** in making their decision to study at Howard and participate in the basketball program.

105.     As a direct and proximate result of Howard's fraudulent misrepresentations, the **Aggrieved Students** have suffered and will continue to suffer economic damages including but not limited to past medical bills, future medical bills, past psychological bills, future psychological

bills, past physical therapy bills, future physical therapy bills, and loss of future economic opportunity.

106.   As a direct and proximate result of Howard's fraudulent misrepresentations, the **Aggrieved Students** have suffered and will continue to suffer non-economic damages including but not limited to a deterioration of psychological, emotional, academic, athletic status, pain, suffering, mental anguish, depression embarrassment, humiliation and disfigurement, all of which is permanent.

107.   Additionally, the **Aggrieved Students** seek punitive damages because the conduct of the Defendants was cruel, extreme and shocking to the conscious.

108.   **Wherefore,** the **Aggrieved Students** demand judgment against Defendants in an amount to be determined at trial but believed to be in excess of $9,000,000 in damages, plus attorneys' fees and costs, and such other and further relief as this Court deems just and proper.

**Fourth Cause of Action**

**(Negligent Misrepresentation)**

**(All Aggrieved Students Against All Defendants)**

109.   **Aggrieved Students** incorporate by reference hereinafter all preceding paragraphs.

110.   Defendants represented to the **Aggrieved Students** and the public at large that it undertook and assumed a duty to follow and abide by the rules and bylaws of the NCAA to protect the integrity and fairness of the Division 1 basketball program, the academic wellbeing and success of all student athletes, and to protect and promote the physical wellbeing of all its student-athletes, including the **Aggrieved Students** from foreseeable harm. Defendants, as NCAA members and signatories, undertook and assumed a duty to protect student-athletes, including the **Aggrieved Students**, from excessive and burdensome practices and/or training regiments. The NCAA rules were in place precisely to avoid the risk and harm that did and continues to befall the **Aggrieved Students.**

111.    Defendants negligently deceived the public and other concerned persons, including the **Aggrieved Students** about the true nature of the basketball program, and the deception of the **Aggrieved Students** was for recruitment and retention purposes.

112.    Defendants' representations were false.   To the extent these representations were no affirmatively made the **Aggrieved Students**, Howard's practice of not abiding by NCAA regulations was a material omission when recruiting them and throughout their attendance.

113.    These representations or omissions were material to the **Aggrieved Students** in making their decision to study at Howard and participate in the basketball program.

114.    As a direct and proximate result of Howard's misrepresentations, the **Aggrieved Students** have suffered and will continue to suffer economic damages including but not limited to past medical bills, future medical bills, past psychological bills, future psychological bills, past physical therapy bills, future physical therapy bills, and loss of future economic opportunity.

115.    As a direct and proximate result of Howard's misrepresentations, the **Aggrieved Students** have suffered and will continue to suffer non-economic damages including but not limited to a deterioration of psychological, emotional, academic, athletic status, pain, suffering, mental anguish, depression embarrassment, humiliation and disfigurement, all of which is permanent.

116.    **Wherefore,** the **Aggrieved Students** demand judgment against Defendants in an amount to be determined at trial but believed to be in excess of $9,000,000 in damages, plus attorneys' fees and costs, and such other and further relief as this Court deems just and proper.

### Fifth Cause of Action

### (Intentional Infliction of Emotional Distress)

### (All Aggrieved Students Against All Defendants)

117.    **Aggrieved Students** incorporate by reference hereinafter all preceding paragraphs.

118.    All Defendants had a duty not to conduct themselves in a manner considered "extreme and outrageous" when it is so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

119.   Defendants intentionally conducted themselves in such a manner as to cause physical and phycological harm to the **Aggrieved Students,** which the **Aggrieved Students** continue to suffer from, causing severe emotional distress.

120.   As a direct and proximate result of the Defendants' intentional extreme misconduct, the **Aggrieved Students** have suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills, and loss of future economic opportunity.

121.   As a direct and proximate result of the Defendants' intentional extreme misconduct, the **Aggrieved Students** have suffered and will continue to suffer non-economic damages including but not limited to a deterioration of their mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

122.   Additionally, the **Aggrieved Students** seek punitive damages because the conduct of the Defendants was cruel, extreme and shocking to the conscious.

123.   **Wherefore, Aggrieved Students** demand judgment against Defendants in an amount to be determined at trial but believed to be in excess of $9,000,000 in damages, plus attorneys' fees and costs, and such other and further relief as this Court deems just and proper.

<u>**Sixth Cause of Action**</u>

**(Breach of Contract)**

**(Madison Against Howard)**

124.   The **Aggrieved Students** incorporate by reference hereinafter all preceding paragraphs.

125.   Madison and Howard entered into a contract whereby Howard agreed to provide higher-education to Madison for participating in intercollegiate sports.

126.    Madison agreed in exchange for such promises by Howard to be granted a scholarship, including room and board, books, and other costs,  to participate in intercollegiate sports.

127.    Madison adhered to and abided by all provisions of the contract.

128.    Howard breached the contract by unforeseeably burdening Madison in a level of *countable athletic related activity* that was far beyond what is permissible via the rules of the NCAA, thereby causing Madison to suffer injury because of the acts and/or omissions of the coaching staff and the Athletic Department.  Additionally, Howard University, through its agents, withdrew and breached on promises to provide Madison with a full athletic scholarship in four out of his five years of attendance.  Furthermore, news that he would not be afforded a scholarship for the upcoming year always came near the end of the academic year, thereby lulling Madison into believing that he would receive a scholarship, causing him to forego action to redress Nickelberry's arbitrary decisions.

129.    Madison has suffered pecuniary loss according to proof as a result of the breach.

130.    **Wherefore,** Madison demands judgment against Howard in an amount to be determined at trial but believed to be in excess of $230,000.00 in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

### Seventh Cause of Action

### (Breach of Contract)

### (All Aggrieved Students Against Howard)

131.    **Aggrieved Students** incorporate by reference hereinafter all preceding paragraphs.

132.    **Aggrieved Students** and Howard entered into a contract whereby the university agreed to abide by all rules and regulations promulgated by Howard and its agents through its Constitution, Bylaws, Compliance Memos and Plans, and numerous authorizations required to participate in the basketball program including the appropriation of the **Aggrieved Students'** likeness and achievements.  **Aggrieved Students** agreed in exchange for such promises by Howard

and its agents to be afforded an education. **Aggrieved Students** adhered to and abided by all provisions of the contracts.

133.   Howard and its agents breached the contract by failing to abide by all rules and regulations promulgated by Howard and the NCAA through their respective Constitutions, Bylaws, Compliance Plans and Memos, and numerous authorizations required to participate in basketball including the appropriations of the **Aggrieved Students'** likeness and achievements.

134.   The NCAA Constitution's preamble expressly states its "core purpose is to ". . . integrate intercollegiate athletics into higher education so that the educational experience of the student-athlete is paramount."

135.   Howard's failure to adhere to the NCAA and its own rules and bylaws caused great burdens and/or failure of the **Aggrieved Students** to properly and effectively benefit from an education as promised.

136.   Wherefore, the **Aggrieved Students** demands judgment against Howard and its agents in an amount to be determined at trial but believed to be in excess of six hundred thousand dollars ($600,000.00) in damages, plus costs of this suit, and such other and further relief as this Court deems just and proper.

### Eighth Cause of Action

### (DC Human Rights Act of 1977))

### (Tease Against Howard)

137.   **Aggrieved Students** incorporate by reference hereinafter all preceding paragraphs.

138.   Defendants Howard and Nickelberry were aware that Tease was affected by ADD and learning disabilities.

139.   Defendants failed to accommodate the needs that Tease required associated with ADD and learning disabilities, and used his knowledge of Tease's learning disability to mock him and ostracize him amongst his teammates.

140.    Defendants intentionally conducted themselves in such a manner as to cause physical and phycological harm to Tease, which Tease continues to suffer from, causing severe emotional distress.

141.    As a direct and proximate result of the Defendants' intentional extreme misconduct, Tease has suffered and will continue to suffer economic damages including but not limited to, past medical bills; future medical bills; past psychological bills; future psychological bills, and loss of future economic opportunity.

142.    As a direct and proximate result of the Defendants' intentional extreme misconduct, Tease has suffered and will continue to suffer non-economic damages including but not limited to a deterioration of their mental status, daily mental struggles, pain, suffering, mental anguish, depression, embarrassment, humiliation and disfigurement; all of which is permanent.

143.    Additionally, Tease seek punitive damages because the conduct of the Defendants was cruel, extreme and shocking to the conscious.

WHEREFORE, Plaintiffs Ausar Madison and Kai Tease pray that judgment be entered in each of their favor and against Defendants Howard University and Kevin Nickelberry, jointly and severally, for compensatory damages, special damages, prejudgment interest, attorney's fees, exemplary damages and punitive damages in an amount as proven at trial, but in no event less than $9,000,000, costs and for whatever other relief the Court deems just and proper.

Respectfully submitted,

_____/s/_____
Stuart L. Peacock, Esq.
LAW OFFICES OF STUART L. PEACOCK
1311 Buchanan Street NW
Washington, DC 20011
(202) 714-6800
DC BAR #428908
stuart.l.peacock@gmail.com

ATTORNEY FOR PLAINTIFFS
Ausar Madison and Kai Tease

# EXHIBIT A

May 18, 2018

I, Ms. Zane Cribbs, am currently a resident of Prince Georges County, in the state of Maryland. I was an employee of Howard University from June 2015 to July 1, 2017. I was employed at Howard University as an "assistant athletic trainer." My duties primarily pertained to providing treatment to injured Howard University athletes to help facilitate their return to full and active participation in their sports programs. As an athletic trainer at Howard University, I spent most of my time treating the men's basketball team. I also worked with the women's volleyball team and women's lacrosse team.

My relationship with Howard University extends beyond my employment, as I am also an alum, a fact that I take immense pride in. Therefore, I feel it is my duty to speak up on behalf of the students that were wronged or harmed by the intentional acts of those in positions of power who claimed to protect the students' best interests, but only did so to secure their trust for their own benefit, then betray that trust in the most irreprehensible manner. Specifically, I am blowing the whistle on Coach Kevin Nickelberry and his staff for abusing their power over the basketball team's players, and psychologically abusing them for years.

During my employment, I witnessed the coaching staff routinely skirt the rules that the Athletic Department's compliance officers would regularly brief the entire basketball staff about. Although I never witnessed the head coach instruct his staff to break the rules, it would have been impossible for him not to have known about what was going on. Players did not have the luxury of missing drills, practices, meets, or any other dictate handed down, unless they were willing to face the wrath that would accompany one's absence. In essence, there was no distinction between voluntary or mandatory team activities or participation. From where I was seeing things, the coaching staff utilized the players' schedules to the highest degree they could. I was concerned by the regular late-night practices that players were forced to participate in, which without a doubt negatively affected the players performances in their school work and physical recovery from the prior days workouts. I know that there were weeks that players were required to participate in team activities seven days straight without any break. If the team would lose a game, then the players were pushed even harder. The harder the players were pushed, the more players would be injured, which resulted in more losses. It was a dangerous and vicious cycle.

In my opinion, injuries occurred on the basketball team at an unreasonably high rate, and the injuries were consistent with those incurred by disproportionate activity in

relation to rest and recovery. I felt too many players were sitting out from injuries too often not to raise eyebrows from the Athletic Director. However, toward the end of my employment at Howard, it appeared that the Athletic Director himself was aware of the excessive and illegal required athletic participation, or, at least purposely turned a blind eye to breaking the NCAA's 20 hour a week rule. Athletic Director Kery Davis's chummy relationship with Coach Nickelberry undermined his ability to enforce the rules that were/are in place for the students' wellbeing and scholastic success. When I felt that Athletic Director Davis became complicit in supporting and facilitating Coach Nickelberry's wrongful acts, rather than acting as a steward of insuring compliance to the rules, I knew that I had to leave Howard University.

I truly came to the conclusion that if a player remained on the basketball team, then that player was probably going to end his basketball career early. A player's hopes of pursuing basketball professionally would be extinguished by a coaching staff that not only did not care about his physical welfare, but would also consciously expose him to risks as a means of punishment, or at the very least for their own personal gain. It was sickening.

Second to the risks or actual physical harm the players faced by the coaching staff, was the mental and emotional abuse (particularly by Coach Nickelberry's main henchman Associate Head Coach Keith Coutreyer). I, personally, chose to leave my job at Howard, rather than be subjected to any more of the toxic environment that Coach Nickelberry and Coach Coutreyer fostered. Unfortunately, the players did not have the luxury of leaving, and many suffered by being ridiculed and demeaned on a daily basis. I watched many young men in the basketball program lose faith in themselves, or lose their motivation to participate in a sport that they used to love. The environment that the coaching staff sought to create was one of either: submit to total and utter allegiance, or we will make your life living hell. A number of players confided in me that they hated playing on the team because of the Coach Nickelberry and wished they could leave.

Furthermore, Coach Nickelberry promoted a culture of diametrically opposed to sportsmanship and ethics which should be a cornerstone of a sports program. Lying, cheating, and aggressiveness toward other players was expressly and implicitly promoted and rewarded. I truly feel that Coach Nickelberry and Coach Coutreyer did not care about the wellbeing of the players, because the program was centered around Nickelberry creating a cult of personality.

I am not a disgruntled ex-employee looking to be vindicated, because Howard University, nor Coach Nickelberry, has not personally wronged me. My only purpose in making this statement is to shine sunlight where it can disinfect a festering injustice to young men who were seeking to better their lives. During my tenure as an athletic

trainer with the men's basketball team, I came to learn that Coach Nickelberry is perhaps one of the most dishonest and callous individuals that I have ever had the displeasure to work with. I do not use these words lightly, nor am exaggerating. I became an athletic trainer at Howard because Howard means the world to me, I care about people, and I love sports. Therefore, I merely seek to right a wrong that is present and that needs to be stopped.

I would like to consider myself a non-judgmental person, who does not focus on peoples' deficiencies, but seeks to see the good in people. However, in the case of Coach Nickelberry, he unfortunately showed me little to compensate for his general repugnant demeanor, because being morally disreputable seemed to be his true character. Over the course of years, I witnessed firsthand Coach Nickelberry lie to people regarding just about anything and everything. Even in matters where he had no incentive to lie, I had witnessed him lie about things that I had personal knowledge of to be false. At times I thought that Coach Nickelberry may have had deeper psychological issues that forbade him from controlling his thoughts or spoken words; not to mention I had seen him have drastic mood swings. Yet, as time passed, I came to believe his behavior was strictly driven by his egotistical drive to always be right or have the last word and establish himself as the most important person in the room. Coach Nickelberry's behavior, unfortunately, caused damage beyond his own reputation; by destroying the bodies and minds of the youth he was supposed to guide. All the wrongful acts I witnessed are too numerous to mention here, but I can say I saw firsthand that the basketball program was in a state of foulness, and it is hurting these young men, perhaps for life.

I declare under the penalty of perjury under the laws of the District of Columbia, State of Maryland, & the State of California that the foregoing 9 paragraphs are true and correct.

Zane Cribbs

rect.

Zane Cribbs

# EXHIBIT B



**Keith Coutreyer** 6/26/2017 1:29pm EST

The play review is not for Freshman it's just for the palyers contacted directly by Coach Whalen, Freshman follow schedule as outlined in earlier blast. Everyone else make surte you are on time for our meeting at 4pm



**Michael Obindu** 6/26/2017 2:05pm EST

Yes sir



**Henry Odunze** 6/26/2017 2:05pm EST

Yes sir



**Zion Cousins** 6/26/2017 2:06pm EST

yes sir



**Keith Coutreyer** 6/27/2017 3:40pm EST

Everyone should be headed to the locker room to prep for our workout, you should be in the lower gym stretching at 4pm and on the floor at 4:15.



**Keith Coutreyer** 6/28/2017 4:55pm EST

I need all players to bring me

Message                                    SEND

# TODAY'S SCHEDULE



**Keith Coutreyer** 6/29/2017 3:04pm EST

We start workouts at 4pm everyone should be on time prep starts at 3:30, stretching at 3:45 lower gym on the floor at 4pm no exceptions all players respond.



**Dalique Mingo** 6/29/2017 3:05pm EST

Yessir



**Nate Garvey** 6/29/2017 3:05pm EST

Yes Sir



**Jalen Jones** 6/29/2017 3:05pm EST

Yes sir



**RJ Cole** 6/29/2017 3:05pm EST

yes sir



**Zion Cousins** 6/29/2017 3:05pm EST

yes sir



**Kyle Foster** 6/29/2017 3:05pm EST

Yes sir



**Tyler Williams** 6/29/2017 3:06pm EST

Message        SEND



**Keith Coutreyer** 7/14/2017 10:39am EST

We will be having Team Workouts on Sunday at 6pm, and Monday at 4pm so the upcoming weeks schedule will be the dame as this weeks make sure you are on time for Weight Training and conditioning today. I am sure that most of you have not picked up your weekly academic evaluations so I will be passing them out on Sunday, I will also be getting times for your academic meetings on Monday. All players respond to this blast.



**Nate Garvey** 7/14/2017 10:40am EST



Yes Sir

**Tyler Williams** 7/14/2017 10:40am EST



yes sir

**Dalique Mingo** 7/14/2017 10:40am EST



Yessir

**Zion Cousins** 7/14/2017 10:40am EST

Message　　　　　　　　　　　　　　SEND



**Keith Coutreyer** 7/16/2017 11:06am EST

The workout time for today will be moved up to 2:30 p.m. you must report to the gym at 2 p.m. for prep we will start on the main floor at 2:30! Coach Whalen will pass out the weekly evaluation forms at the end of the work out at 4:30. I am still in New Jersey at an AAU event, but I will meet with everyone tomorrow. All sophomore through seniors must meet with me between 1 and 3:30 p.m. tomorrow, meetings will take about 10 minutes for each person come over as your schedule permits. I will meet with the freshman at 6pm during their study hall. We will work out tomorrow as a team from 4 to 5 p.m., all players respond no exceptions!

**Michael Obindu** 7/16/2017 11:08am EST

 Yes sir

Message                                          SEND



**Keith Coutreyer** 7/17/2017 9:43am EST

I am moving the meetings with returning players to Tuesday between 1-4 pm as you have availability in your schedule. I will meet Freshman tonight at your study hall. I will collect Academic summaries from everone after 4pm workouts, all players respond.



**Charles Williams** 7/17/2017 9:44am EST

 Yes sir

**Kyle Foster** 7/17/2017 9:44am EST

 Yes sir

**Jalen Jones** 7/17/2017 9:45am EST

 Yes sir

**Cameron Lewis** 7/17/2017 9:45am EST

 Yes sir

**Tyler Williams** 7/17/2017 9:46am EST

 yes sir

**Phillip Jones** 7/17/2017 9:47am EST

Message | SEND

# TODAY'S SCHEDULE 

**Keith Coutreyer** 7/18/2017 10:29am EST

 We will workout today, come over at 3:30 for prep we will start at 4:15 and end at 5:15 so freshman can make the cafe.

**Phillip Jones** 7/18/2017 10:30am EST

 Yes sir

**RJ Cole** 7/18/2017 10:30am EST

 yes sir

**Tyler Williams** 7/18/2017 10:30am EST

 yes sir

**Michael Obindu** 7/18/2017 10:31am EST

 Yes sir

**Zion Cousins** 7/18/2017 10:31am EST

 yes sir

**Cameron Lewis** 7/18/2017 10:32am EST

 Yes sir

**Henry Odunze** 7/18/2017 10:32am EST

 Yes sir

Message | SEND



**Keith Coutreyer** 7/23/2017 12:02pm EST

Today's practice with star at 8 p.m. as coach nickleberry and the rest of the coaching staff is traveling back from recruiting all players should meet at the gym at 7:15 for prep , stretching at 7:30 and Coach well and will take you through actions at 7:45. All players respond to this blast! Injured players should also show up to watch the workout you must be on time as well



**Kyle Foster** 7/23/2017 12:02pm EST

Yes sir



**Charles Williams** 7/23/2017 12:02pm EST

Yes sir



**Jalen Jones** 7/23/2017 12:03pm EST

Yes sir



**Dalique Mingo** 7/23/2017 12:03pm EST

Yessir



Message                                    SEND

‹  TODAY'S SCHEDULE  

**Keith Coutreyer** 7/24/2017 1:06pm EST

We will have Team workouts today at 4 p.m. everybody should report for prep at 3:30 p.m. . I am also collecting progress reports tonight we will have a mandatory academic team meeting at 8 p.m. in the locker room for everyone freshman and returning players we will go over check out protocol give you temporary housing information and talk about the progress reports meeting should not take more than 30 minutes. All players respond



**Tyler Williams** 7/24/2017 1:06pm EST


yes sir

**Phillip Jones** 7/24/2017 1:07pm EST


Yes sir

**Nate Garvey** 7/24/2017 1:07pm EST


Yes Sir

**Zion Cousins** 7/24/2017 1:07pm EST

Message                                SEND



**Keith Coutreyer** 8/27/2017 12:43pm EST

> **Remember today's workout starts at 5 p.m. so you must l arrived at 4 p.m. for prep everyone must be taped on the floor stretching at 4:45! All players respond**



**Dalique Mingo** 8/27/2017 12:44pm EST

> **Yessir**



**Henry Odunze** 8/27/2017 12:44pm EST

> **Yes sir**



**BJ Idosunmu** 8/27/2017 12:44pm EST

> **Yes sir**



**Gerald Mallison** 8/27/2017 12:44pm EST

> **Yessir**



**Michael Obindu** 8/27/2017 12:44pm EST

> **Yes sir**



**Drummond Justin** 8/27/2017 12:44pm EST

> **yes sir**



**RJ Cole** 8/27/2017 12:45pm EST

> **yessir**



Message          SEND



**Keith Coutreyer** 9/4/2017 4:24pm EST

Everyone should be back on campus by 8pm tonight. I need all of you to utilize the check in feature on Teamsynched tonight at 10pm. We will be using that feature for class check-in and study hall check in and I am nor accepting the excuse that it is not working on my phone or I didn't know how to do it. By doing this test tonight It will give me the opportunity to verify any issue you may be having. This is not a request its a requirement, failure to comply will result in consequences! Tomorrow we start study hall and class check-in and your syllabi are due tomorrow. Team workout tomorrow will be preceded by a 5:30 meeting with Coach Nick in the locker room conference area so prep will start at 4:30 or as soon as you get out of class.

Message                                    SEND

Case 1:18-cv-08852 Document 1-1 Filed 10/11/18 Page 52 of 68



Keith Coutreyer 9/8/2017 9:59pm EST

**Clarification on Weekends schedule: Tomorrow you guys have open gym at 10am, Sunday Study hall is from 2-4pm , you will have opportunity to go the cafe then prep is at 5:15 pm, workout starts at 6pm. All players need to rrspond before open gym tomorrow!**



Cameron Lewis 9/8/2017 9:59pm EST


Yes sir

Nate Garvey 9/8/2017 10:00pm EST


Yes Sir

Phillip Jones 9/8/2017 10:00pm EST


Yes sir

Zion Cousins 9/8/2017 10:00pm EST


yes

Gerald Mallison 9/8/2017 10:00pm EST


Yes sir

Jalen Jones 9/8/2017 10:01pm EST



Message | SEND



**Keith Coutreyer** 9/12/2017 1:57pm EST



Prep at 5:30 , workout will start at 6:30, be on time and ready to do your part to make practice more enjoyable. Compete at your highest level, work you ass off and put we before me! All players respond

**Charles Williams** 9/12/2017 1:58pm EST


Yes sir

**Justin Cotton** 9/12/2017 1:58pm EST


Yessir

**Cameron Lewis** 9/12/2017 1:58pm EST


Yes sir

**Kyle Foster** 9/12/2017 1:59pm EST


Yessir

**Michael Obindu** 9/12/2017 1:59pm EST


Yes sir

**Marcus Hall** 9/12/2017 1:59pm EST


yes sir

Message                          SEND

# EXHIBIT C

**MEN'S S BASKETBALL Four-Day Strength & Conditioning Program**
page 1

**\*All four workouts should be done in one week. Please take notice that the workouts are broke up into WEEK 1 & WEEK 3 and WEEK 2 & WEEK 4 so please pay attention**

-Start each workout with 20-30 minutes on a treadmill as your warm-up (set incline level at 3 or higher), 20 minutes on a Precor elliptical machine (set at level 6 or higher), or 20-minute ride at level 7 or higher.

## WORKOUT 1 MONDAY (DAY 1) WEEK 1 & WEEK 3

- Barbell Bench Press (4 sets) 12-10-8-burnout (increase weight in 2nd & 3rd set) Do burnout set with starting weight. (start with at least 45lbs on each side with 20lb increases each set)

- Jump Rope 3 x 150 (quickly 30 seconds between sets)

- Dumbbell 2way Raise (front & side) 3 x 8 (16 each set) form an L shape and alternate sides

- Bench Dips  3 x 10 to 12 in each set (with a 35lb plate or more in your lap and feet elevated) or a regular dip if you have access to a dip bar.

- Bench Crunches 4 x 20

- Dumbbell Bench Row  4 x 10 (50 to 60lbs ten each arm) increase in the 3rd set

- Barbell Curls  4 x 8-10 (with at least 15lbs on each side of the bar)

- Seated Dumbbell Hammer Curls 3 x 10 (both arms together 30lbs or more in each hand)

- Jump Rope  3 x 200

- Dumbbell Sumo Squats  3 x 12 (use at least 50lbs) only 45 seconds between sets

- Leg Press (5 sets)  10-8-8-6-burnout with starting weight of 130lbs (increase weight 50lbs in 2nd, 3rd, 4th set) 5th set burnout with the same weight you started with in your first set.

- Dumbbell Side Lunges (reverse) 3 x 10 (with at least 30lbs in each hand) alternating legs (20 in each set) Demo link: http://www.stack.com/video/89354892001/dumbbell-side-lunge/

- Dumbbell Deadlift 3 x 12 (No less than 35lbs in each hand)

## AB CIRCUIT

**X-Toe Touches**  3 x 30 (alternate) on your back, legs up to the sky, reach left hand to right toe then right hand to left toe (repeat)

**Crunches**  3 x 35 (leg up)

**Swim kicks**  3 x 60 (small) on your back, legs str8, toes pointed, kick you foot covering about 18"

**Spiders**  3 x 20 (push up position legs bring your legs with knees bent to your side parallel to your body and then return your foot to the floor. Alternating your legs for this movement)

**RUN (DAY 2) TUESDAY WEEK 1 & WEEK 3** (this should be done the day after Workout 1)

## WEEK 1 TUESDAY RUN

- Jog 2 laps around the field on the turf (then stretch)

- Sprint from the goal line to the 20 (at 70-75% of your top speed). Continue to jog at 50% of your top speed for 10 more yds. Then sprint 20yds (at 70-75% of top speed). Then jog for 20yds. Then sprint for 30yds (80-85%) to the goal line. *Repeat 8 times*

- Starting out of bounds on the side line. Sprint at 80% of your top speed from the 20 to the 20 yard line (60yds). Walk from the 20 to the goal line. Then lunge from the goal line to the goal post. Walk from goal post to the goal line on the other side of the field (this is your recovery time).  Continue walking to the 20 yard line and sprint again at 80% of your top speed from the 20 to the 20 yard line. Walk from the 20 to the goal line through the end zone back to the 20 where you started. You now should have completed a full circle around the field *REPEAT THIS 6 TIMES.*

- Jog 2 laps to complete your workout (medium pace)

**AB Work** Choose any 3 movements from the previous AB work out and do as a circuit


## Week 3 TUESDAY & RUN

- Jog 2 laps around the field on the turf (then stretch)

- Four 150 meters sprints at 70% of your top speed (on the track) 150 yards is roughly from the end zone goal post to the finish line of the 100 meter dash. (Means you start in the middle of the turn and run the whole straightaway)

- Six 80 yard sprints at 80% of your top speed (on the turf) from the 10 yard line to the 10 yard line

- Eight 40 yard sprints at 90% of your top speed (on the turf) from the 30 yard line to the 30 yard line

- Jog 2 more laps (medium pace)

**ABS** Choose any 3 AB movements from pervious workouts and do as a circuit

## WORKOUT WEDNESDAY (WEEK 1 & WEEK 3)

- Jump Rope   3 x 200

- Jump Squats   3 x 10 (hug a 35lb or 45lb plate) rear end to your heels & exploded up (get air)

- Dumbbell Single Leg Dead Lift 3 x 10 (Start with 25lbs in each hand) increase weight each set

- Quad Leg Extensions   3 x 12 (push yourself) use at least 90lbs

- Barbell Calf Raises   4 x 10 (slowly) a 3-count going up and 2 count coming down (use 45lbs plate on each side)

- Incline Dumbbell (iso) Bench 3 x 10 increase in the 2nd set (use at least 35lbs in each hand)

- Front Lat Cable Pulls   3 x 10 - 12 (increase weight each set) hands wide /pull up motion (start with at least 110lbs)

- Lat Cable Chin-ups   3 x 8 - 10 (palms facing you and use close grip) use the final weight from last exercise  (start with at least 120lbs)

- Seated Dumbbell Curls   3 x 10  (25lbs at least n each hand)

- Military (iso) Press   3 x 8 (8 each arm use at least 25lbs keeping 1 dumbbell in up at all times and alternate)

- Dumbbell Tricep Super Set (Pull Overs) 4 x 10 Demo link: http://www.stack.com/video/2914759952001/todd-durkins-worldclass-workouts-rolling-tricep-superset/ (use 25lbs or more).

- Platform Dips  4 x 15 (feet on the floor) with 25lbs or more in your lap

## ABS

**Abs circles**  (15 left & 15 right) x 3

**Bench Crunch** 3 x 20

**Med-Ball or Dumbbell Twist** (20lbs – 25lbs)  3 x 24

**Plank** 60 seconds x 3

## *TAKE TOMORROW OFF FROM WEIGHTS!!!!! (get up shots)*

## Workout 4 FRIDAY (DAY 6) WEEK 1 & WEEK 3

-   Jump Rope   3 x 200 (60 seconds between sets)

-   Dumbbell (iso) Bench Press 4 x 10-8-6-6 (keep one dumbbell up at all times) increase weight in 2nd & 3rd set (start with 40lbs in each hand)

-   Barbell Squat 4 x 8 (Tempo) start with at least 35lbs to 45lbs on each side increase 3rd & 4th set (45 sec btw sets) add 10lbs each set or more.

-   2 Way Raises (front to side) 4 x 6 (use at least 15lbs)

-   Jump Rope 3 x 100 (30 seconds between sets)

-   Inverted Pull-ups 4 x 8  (your palms face away from you, feet on the ground & plank your body) or just do regular pull ups with your hands shoulder width.

-   Seated Dumbbell Curls to press  3 x 8 use at least 30lbs

-   Jump Rope 3 x 200 (45 second between sets)

-   Platform or Bench Dips  3 x 10 (with feet elevated) with 45lbs in your lap

-   Bench Crunch 4 x 25

-   Push Ups  4 x 20 per set

-   Box Jumps 3 x 8 (If You Can) Otherwise Leg Press 75% of your body weight 3 x 12 – 15 reps

-   Dumbbell Reverse Lunge 3 x 12 (with 30- 40lb dumbbells) Do all 12 reps repeatedly one leg at a time, thus 24 in each set. (It's a step back motion)

-   Hamstring Curls  4 x 8 - 10

-   Jump Rope  3 x 100

## AB CIRCUIT

**Swim Kicks**  3 x 60 (**40 small** are 18 inches  & **20 Big** are 36 inches) alternate your legs with toes pointed

**Abductor Circles** 3 x 12 (left & right) 24 in each set. Start on your back, legs together and str8, toes pointed at 6 inches of the ground. Circle both leg at the same time left 12 then right 12 times.

**Med-Ball or Dumbbell twist** (20 lbs.) 3 x 24

**Crunches**  3 x 30 (legs up)

## *TAKE WEEKEND OFF FROM WEIGHT (DO DRILLS)!!!!!!!!!!!!*

## Workout 1 MONDAY (WEEK 2 & WEEK 4)

-        Jump Rope   4 x 100 (45 seconds btw sets)

-        Hang Clean (4 sets) 10-6-8-6 same weight 60 seconds between sets

-        Front Plate Raise   3 x 8 (raise plate over your head using at least 35lb plate)

-        Jump Rope 3 x 150 (quickly 30 seconds between sets)

-        Push Ups  3 x 20-25

-        Superman's   3 x 12  (Lay face down legs & arms extended. Raise both legs and arms at the same time, hold for a 2 count then down and repeat)

-        Bench Crunch 4 x 25

-        Dumbbell Bench Row   4 x 8 **HEAVY** (50lbs or more)

-        Str8 Bar or Barbell Curls   4 x 8 (at least 15lbs on each side) or Machine & use 60-70lbs.

-        Seated Dumbbell Hammer Curls 3 x 10 (both arms together) at least 30lbs in each hand

-        Jump Rope   3 x 200

-        Seated Military Dumbbell Press 3 x 10-8-6 increase weight in 2nd & 3rd set (start with at least 30lbs)

-        Leg Press (5 sets)  10-8-8-6-burnout (increase weight by 40 lbs in each set/ burnout set use starting weight) start with at least 130lbs

-        Dumbbell Walking Lunges (forward & reverse) 3 x 15 (with at least 30lbs in each hand) take 30 steps 15 each leg

-        Barbell or Str8 Bar Deadlift 4 x 8 (grip just outside your shoulders use at least 35lbs on each side)

### AB CIRCUIT

**Spiders**  3 x 30 (alternate 15 each leg)

**Crunches**  3 x 50

**Swim kicks**  3 x 60 (small) 30 each leg

**Heel Touch** 3 x 40 (also known as penguins)

## Workout 2 TUESDAY & (WEEK 2 & WEEK 4) *(Do the day after workout 1)*

### (NO Treadmill, Weights or Elliptical today)

If you have access to a track/football field

-     Jog two laps around football field (warm up)

-     Stretch for 15-20 mins

-     Run field X's (run from one corner of the football field across to the other corner (diagonally). Then lunge the goal line to other side of the field. (Staying at the same end of the field)

-     Then run diagonally across the field to the other corner of the end zone to form your "X". (Then walk the goal line back to the starting position and repeat). You will do this 8 times. The first 4 times you will lunge the goal line *forward*, the next 4 times *reverse* lunge the goal line. **DO NOT TAKE A BREAK UNTIL YOU COMPLETE THE 4 "X's" IN EACH SET!!!!!**

-     After you complete the 8 "X's". Then run eight to ten 40-yard sprints and jog two laps around the field on the turf to complete run.

**ABS** Choose any 3 AB movements from pervious workouts and do a circuit

## Workout 3 WEDNESDAY (WEEK 2 & WEEK 4)

-     Jump Rope   3 x 200

-     Dumbbell Bench Press (iso)  3 x 10-8-6 (increase weight) start with at least 30lbs in each hand

-     Squat Press  4 x 10 (Do not increase weight) use just the Str8 bar/Barbell (hold the bar in front of you at shoulder level, squat deep than stand up while pressing the bar over your head return bar to start position) *use at least 15 to 20lbs on each side*

-     Dumbbell Raises (front & side)  3 x 12 use at least 15lbs (make L shape)

-     Jump Rope 3 x 100 (30 seconds between sets)

-     Front Lat Cable Pull Chin-up (close grip/palms facing you) 3 x 12 (increase weight) start with at least 130lbs

-     Seated Dumbbell Curl 3 x 6 (both arms at the same time) use 30lbs or more

-     Dumbbell Skull Crushers  4 x 8 (use at least 20-25lbs in each hand)

-     Bench Crunch  4 x 20

- Dumbbell Row  3 x 8 (heavy) use at least 50lbs

- Quad Extensions   4 x 12-12-10-8 (increase weight each set)

- Dumbbell Single Leg Deadlift   4 x 8 (alternating each leg 16 total in each set) use at least 25lbs in each hand. Increase in the 3rd set.

- Jump Rope   3 x 200

- Jump Touch 3 x 24 (find a high place to jump and touch repeatedly 12 on each leg alternating which hand you touch with) *RAPIDLY*


**AB CIRCUIT**

**Swim Kicks**  3 x 60 (40 small & 20 big)

 **Ab circles** (15 left & 15 right)

**Med-Ball or Dumbbell twist** (25 lbs – 35lbs.) 3 x 24

**Bicycle Crunches** 3 x 40

## *TAKE TOMORROW OFF (get shots up)!!!!!*


## Workout 4 FRIDAY (WEEK 2 & WEEK 4)

- Squats 4 x 10-8-8-6 (increase weight) start with at least 35lbs on each side

- Single Leg Lunge 3 x 12 (with the Str8 Bar/Barbell) Do all 12 reps repeatedly one leg at a time, thus 24 in each set. (It's a stepping forward motion *rapidly*) use at least 25lbs on each side

- Dumbbell Deadlift 3 x 8 (increase weight each set) use at least 35lb dumbbells in each hand

- Incline Bench Press 3 x 10-8-8 (increase in 2nd & 3rd )  use at least 35lbs on each side

- Dumbbell Side Raises 4 x 8 (do not increase weight) use at least 20lbs dumbbells

- Dumbbell Snatch 4 x 6 (6 on each arm) use at least 40lb dumbbell (refer to **stack.com** for how to)

- Front Lat Cable Pull 4 x 12-10-8-6 (increase weight each set) With a wide grip and plams facing away fro you, Pull bar just below your chin. Start with at least 110lbs

- Dumbbell Side Raises  3 x 8 use at least 15lbs

**Page 8**

Dumbbell Tricep Super Set (Pull Overs) 3 x 10

- Seated Dumbbell Curl to Press 3 x 10 (use at least 25lb in each hand)

- Standing Hammer Curls  3 x 8 (use at least 30lbs)


**AB CIRCUIT**

**Bench Leg & Hip Raises** 4 x 15 (do on a bench and point toes)

**Bench Crunch** 4 x 20

**Heel Touch** 3 x 60


Gentleman let's prepare like champions this off-season. It all starts with what you do when no one is watching. Whatever you are going to be as a player and a team starts with each and every one of you pushing yourselves this summer. If the workouts are killing you, the good news is you can die again tomorrow. Let's bring the pride back. ***"Hard work brings big rewards."***

**If you have any questions contact me eric.johnston@howard.edu. For additional help with workouts, training videos, and dieting go to STACK.COM.**


### *DRILS (for Saturdays) Sprint & Free Throw*



**Sets/Reps:** Start with 2 trips through part A, then 2 trips (w/ball) through part B.

| PART A | PART B |
|--------|--------|
| • Sprint | Sprint (dribble with strong hand) |
| • High Knees | Jog (dribble with weak hand) |
| • Sprint | Sprint (dribble with strong hand) |
| • Defensive Shuffles | Jog (dribble with weak hand) |
| • Sprint | Sprint (dribble with strong hand) |
| • Backpedal | Jog (dribble with weak hand) |
| • Sprint to the foul line | Sprint (dribble with weak hand to the foul line) |

When you get to the foul line take 20 shots your goal is to make at least 15 out of 20.

L-Agility Drill



**Movement Pattern:**

**Page 10**

- Do this drill from the right and left side of the baseline. Do 3 sets of 5 from left and right side.
- Start on right side of the key at the baseline
- Sprint to and touch cone A
- Backpedal to the baseline
- Sprint back to cone A
- Drop into athletic position and defensive-slide to cone B
- Touch cone B with your left hand, reverse the motion and backpedal to start
  *Note: perform the entire drill at full speed.*

# EXHIBIT D



# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
## INFORMATION SHEET

Ausar Madison and Kai Tease

Case Number: **2018 CA 006902 B**

vs

Date: _____

Howard University and Kevin Nickelberry

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)* | Relationship to Lawsuit |
|---|---|
| STUART L. PEACOCK | |
| Firm Name: | ☒ Attorney for Plaintiff |
| LAW OFFICES OF STUART L. PEACOCK | ☐ Self (Pro Se) |
| Telephone No.:         Six digit Unified Bar No.: | ☐ Other: _____ |
| (202) 714-6800          428908 | |

TYPE OF CASE:  ☐ Non-Jury      ☐ 6 Person Jury      ☒ 12 Person Jury
Demand: $ 9,000,000.00                    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED
Case No.: N/A _____ Judge: _____ Calendar #: _____

Case No.: _____ Judge: _____ Calendar#: _____

---

**NATURE OF SUIT:**     *(Check One Box Only)*

### A. CONTRACTS                    COLLECTION CASES

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
         Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
         Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
         Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
         Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
         Under $25,000 Consent Denied

### B. PROPERTY TORTS

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

### C. PERSONAL TORTS

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
         Not Malpractice)

☒ 17 Personal Injury- (Not Automobile,
         Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

/s/ Stuart L. Peacock, Esq.

Attorney's Signature

September 28, 2018

Date

CV-496/ June 2015